■ In the Matter of CHRISTOPHER CULVER, Respondent, v KRISTI VANPATTEN CULVER, Appellant. [918 NYS2d 619]—

Spain, J.

Petitioner (hereinafter the father) and respondent (hereinafter the mother) are the parents of a daughter born in 2005. In February 2007, the father, an elementary school teacher, was arrested and charged in a 49-count indictment with sexually molesting a number of boys in his class. In March 2007, the father signed a separation agreement which made no provision for custody or visitation of the child, who continued to reside with the mother. Thereafter, while the mother initially permitted the father to visit with the child, in July 2007—when the child was 18 months old—she refused the father any further visitation. The father pleaded guilty to the entire indictment and was sentenced in January 2008 to an agreed-upon aggregate prison sentence of 12 years. On his appeal, this Court affirmed the conviction (*People v Culver*, 69 AD3d 976 [2010]).

The parties were divorced in August 2008 in a judgment

which incorporated their separation agreement. In November 2008, the father filed a petition in Family Court seeking regular visitation with the child at the place of his incarceration, a correctional facility in Clinton County, located about three hours by car from the child's residence. Included in the father's petition were affidavits from his parents and his sister offering to provide transportation to and supervision during the requested visits.

After four days of trial at which numerous witnesses testified, Family Court awarded the mother full custody and granted the father four visits per year with the child at the correctional facility where he is confined or such other facility provided it is within 150 miles of the mother's residence. The court further ordered, among other things, that the child be accompanied by a responsible adult—other than the mother—with whom the child is familiar and who will cooperate with the mother and father in effectuating each visit, that the child and her escorts engage in counseling in preparation for and subsequent to each visit, and that the father have monitored telephone contact and written communication with the child. The mother was directed to bear the cost of said counseling and telephone calls.[1] The mother now appeals.

"[T]he best interests of children generally lie with a meaningful relationship with both parents" (*Tait v Tait*, 44 AD3d 1142, 1143 [2007]) and "[v]isitation with a noncustodial parent is presumed to be in a child's best interests even when the parent is incarcerated" (*Matter of Chambers v Renaud*, 72 AD3d 1433, 1434 [2010]; *see Matter of Garraway v Laforet*, 68 AD3d 1192, 1193 [2009]). "A court should not base a denial of visitation on the strong opposition of the custodial parent" (*Matter of Buffin v Mosley*, 263 AD2d 962, 962 [1999]); "[s]ubstantial proof that such visitation would be harmful to the child will, however, justify the denial of an application for visitation" (*Matter of Davis v Davis*, 232 AD2d 773, 773 [1996]). The totality of the circumstances must be considered in determining such an application (*see Matter of Garraway v Laforet*, 68 AD3d at 1194), including the distance the child would have to travel in order to effectuate visitation (*see id.*). "The propriety of visitation is left to the sound discretion of Family Court and its findings, guided by the best interests of the child, will not be disturbed unless they lack a sound basis in the record" (*Matter of Moore v Schill*, 44 AD3d 1123, 1123 [2007] [citations omitted]).

Here, the mother opposes visitation asserting, among other

1. A stay of Family Court's order pending this appeal was issued by this Court and has been in effect since October 2, 2009.

reasons, that the child does not know her father, does not enjoy long car rides and that such visitation will likely frighten the child. The mother testified, however, that, prior to the father's arrest, he enjoyed "[a] decent father-daughter relationship"—a fact corroborated by the testimony of others who have known the father and child—and that, since the father's incarceration, the child has begun to inquire about his whereabouts. To the mother's credit, the child has received mail from the father on a regular basis, and both the child's paternal aunt and paternal grandparents—who have been permitted ongoing relationships with the child by the mother—are willing to transport the child to the correctional facility and cooperate with the mother's related wishes—e.g., to not discuss the specific circumstances surrounding the father's incarceration and to attend counseling in order to facilitate the visits. The father testified that, prior to his arrest, he was very involved in the child's life and that, if granted visitation, he would abide by any limitations the mother imposes with respect to the content of the conversations between himself and the child—e.g., excluding any discussion of his conviction and guilt or innocence. The record further reflects that a number of accommodations are made at the prison to make children who visit their parents more comfortable during visits.

The key objective evidence presented came in the form of conflicting opinions of experts, each of whom met with the mother and the child. Family Court found "persuasive and reasoned" the report and testimony of Jerold Grodin, a licensed psychologist with significant experience in the field of child psychology, who testified for the father. Grodin opined that visitation with the father, even at his correctional facility, would be "healthful and safe" and in the child's best interests because the child seems to be comfortable in new situations and is quite inquisitive, and also because of the inherent need for any child to maintain contact with both parents. His interaction with the child also revealed a bond between the child and father and a desire on the part of the child to contact the father. Grodin discussed how children who are separated from their parents, without a clear understanding, tend to develop feelings of abandonment. Grodin further concluded that visitation would not be traumatic for the child and that it could be facilitated by therapeutic counseling. Steven Wood, a licensed mental health counselor and clinical specialist with significant experience in child and adolescent therapy testified for the mother and disagreed. Specifically, Wood asserted that because the child is beginning to reach the age at which she will begin forming substantive memories, visiting her father in prison may damage

her future relationship with him. In Wood's opinion, the child does not have sufficient life experience to be able to go through the process of visiting a maximum security prison. Wood also concluded that, while the individual processes the child would have to go through to visit the father would not—in themselves—be traumatic, the cumulative effect of such an experience would be. Yet, Wood also concluded that the child was stable, did not demonstrate an increased vulnerability to social trauma and did not express a fear of her father and that, although the child did not feel abandoned by her father, any child who had a parent disappear could develop a feeling of abandonment.

While the child has not seen her father since she was 18 months old,[2] there is clearly an established relationship between the child and the father as evidenced by the child's own behavior. Indeed, it cannot be said that the father is "essentially a stranger to the child" (*Matter of Cole v Comfort*, 63 AD3d 1234, 1236 [2009], *lv denied* 13 NY3d 706 [2009]). That the child is young and will likely need to travel a considerable distance between her residence and the father's prison does not necessarily preclude visitation (*see Matter of Moore v Schill*, 44 AD3d at 1123). Importantly, Family Court identified several trustworthy people known to the mother and the child, as opposed to "virtual strangers," who are willing to accept this responsibility (*Matter of Goldsmith v Goldsmith*, 68 AD3d 1209, 1210 [2009]; *see Matter of Conklin v Hernandez*, 41 AD3d 908, 911 [2007]), thereby making visitation "viable and workable" (*Matter of Albanese v Albanese*, 44 AD3d 1117, 1120 [2007]), and the father will never be alone with the child. While the father's prison term is long and the offenses for which he is incarcerated are undeniably disturbing—and visitation will likely not be easy—we cannot say that Family Court's discretionary conclusion is unsound.

We do, however, agree with the mother's contention that she should not be required to pay for the telephone calls and the counseling for the child and her escorts before and after the visits. While the record on appeal is barren of any evidence of the parties' financial circumstances or of the mother's financial ability to pay for these potentially costly and long-term expenses, at the time that the mother applied for the stay of Family Court's order, she reported—in an affidavit to this Court—that she was a single mother with a very modest income as a church pastor, received no child support, relied on her mother for

---

**2.** Almost a year and a half of this period of time is attributable to this Court's stay of Family Court's order.

financial assistance and had no health insurance to cover counseling expenses for the child (and any insurance she might obtain would not cover the father's family members). Under these circumstances, requiring the mother to pay for the father's visitation-related expenses would deplete the resources available to the child. It is the father who should bear the responsibility (or pursue third-party or family assistance) to pay all expenses associated with visitation, including counseling[3] and telephone calls, all of which are necessitated by his incarceration (*see e.g. Matter of Franklin v Richey*, 57 AD3d 663, 664-665 [2008]; *Matter of Albanese v Albanese*, 44 AD3d at 1120; *Matter of Moore v Schill*, 44 AD3d at 1123).

Malone Jr. and Stein, JJ., concur.

Peters, J.P. (dissenting). We respectfully dissent. The parties' daughter was born in 2005. Before she was even conceived, petitioner (hereinafter the father) began molesting students in his elementary school. A teacher, he chose his own students to victimize.

When his daughter was 14 months of age, the father was arrested and charged in a 49-count indictment with sexually molesting eight boys under the age of 11. Shortly thereafter, he signed a separation agreement which made no provision for custody or visitation. After pleading guilty to the entire indictment, he was sentenced, in January 2008, to an aggregate sentence of 12 years in prison. After sentencing, but before this Court affirmed his conviction (*People v Culver*, 69 AD3d 976 [2010]), he filed a petition in Family Court seeking visitation at the facility where he was incarcerated. At the time his petition was filed, he had not seen the child for over one year.

Despite the fact that this father's reprehensible conduct toward children—who had been placed in his trust—had torn her family asunder, respondent (hereinafter the mother) fostered a positive relationship between her daughter and the child's paternal relatives. She also permitted correspondence between the father and the child.

Prior to the fact-finding hearing concerning visitation, the child and her mother were evaluated by experts who rendered conflicting opinions at trial. Significantly, neither expert evaluated the father. While a visit to the institution of his incarceration for such purpose may have been challenging, it strikes us

---

**3.** If the mother has since obtained—or in the future acquires—health insurance covering counseling expenses for the child, the mother must utilize that coverage to its fullest extent, with the father remaining responsible for any non-covered expenses.

as disingenuous for an expert to opine that visitation with a convicted sex offender in a maximum security prison setting serves the best interests of an infant without conducting even a perfunctory assessment of that offender.

The majority opines that "[w]hile the child has not seen her father since she was 18 months old, there is clearly an established relationship between the child and the father." During the time this "relationship" was forming, the father was sexually abusing young boys in his classroom. A "relationship" may have existed, but one cannot conclude that it was a healthy parent-child relationship. Moreover, at the time of the fact-finding hearing, the father had not engaged in sex offender treatment. Strikingly, in testifying at the hearing, he refused to acknowledge his criminal conduct and declined any need for sex offender treatment, instead asserting that he had been "railroaded."

It is against this backdrop that relevant law should be applied. To be sure, visitation with a noncustodial parent is presumed to be in a child's best interests (*see Matter of Chambers v Renaud*, 72 AD3d 1433, 1434 [2010]). And, while "the incarceration of a noncustodial parent shall not, by itself, preclude visitation with his or her child, a denial of an application for visitation is proper where evidence demonstrates that visitation would not be in the child's best interest[s]" (*Matter of Conklin v Hernandez*, 41 AD3d 908, 910 [2007] [internal quotation marks and citations omitted]; *see Matter of Morelli v Tucker*, 48 AD3d 919, 920 [2008], *lv denied* 10 NY3d 709 [2008]). Moreover, if Family Court has exercised its sound discretion in assessing best interests, its findings will not be disturbed unless lacking a sound and substantial basis in the record (*see Matter of Cole v Comfort*, 63 AD3d 1234, 1235 [2009], *lv denied* 13 NY3d 706 [2009]). Yet, we are unable to glean sound discretion from Family Court's decision or substantial support for its findings as to the propriety of visitation. In fact, consideration of the relevant factors leads us to the inescapable conclusion that visitation under these circumstances would not serve the child's best interests.

The father's crimes are serious, were committed against young children who had been placed in his trust, and have resulted in a lengthy sentence. The record is bereft of any evidence that he attempted to receive treatment for his urges and conduct prior to his arrest or incarceration, or thereafter. Thus, as stated by the mother's counsel at the fact-finding hearing, the father is a "convicted, unrepentant, untreated pederast." He committed these serious acts prior to and during his "rela-

tionship" with his child and has not seen her since she was 18 months old. While the child has been described as well adjusted, the full credit for this result must be granted to the mother, for we cannot conclude that a father who leaves the home he shares with his infant daughter in the morning to molest his students during the school day could properly have a healthy emotional relationship with this child.

Given this father's lengthy prison sentence, the horrific nature of the underlying sex offenses, his refusal to acknowledge his conduct or his need for sex abuse counseling, the distance the child would have to travel to exercise visitation in a maximum security prison setting, and the fact that more than three years have now elapsed since he has seen the child, we find lacking any sound and substantial basis in this record for Family Court's conclusion that future visitation would serve the child's best interests (see Matter of Gutkaiss v Leahy, 285 AD2d 752, 753 [2001]; Matter of Rogowski v Rogowski, 251 AD2d 827, 827-828 [1998]; Matter of Hadsell v Hadsell, 249 AD2d 853, 854 [1998], lv denied 92 NY2d 809 [1998]; see also Matter of Jasmin E.R., 303 AD2d 1034, 1035 [2003]). That Family Court could further reward the father by requiring that the mother pay the cost of counseling to prepare her daughter for prison visits truly adds insult to injury. For these reasons, we would reverse Family Court's order and permit weekly monitored letters to the child and monthly monitored telephone calls with all costs to be borne by the father.

Egan Jr., J., concurs. Ordered that the order is modified, on the facts, without costs, by reversing so much thereof as holds respondent financially responsible for all expenses associated with visitation including, but not limited to, counseling and telephone expenses, unless she has since obtained or in the future acquires health insurance covering such counseling expenses, in which case the mother shall utilize that coverage, and, as so modified, affirmed.